## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NEW GEORGIA PROJECT, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CHRISTOPHER M. CARR, in his official capacity as the Attorney General of Georgia, et al.,<br><br>    Defendants. | Civil Action No.<br>1:22-cv-03533-VMC |

## OPINION AND ORDER

Before the Court is the Motion of Plaintiffs New Georgia Project, Inc. and New Georgia Project Action Fund, Inc. for a Preliminary Injunction ("Motion," Doc. 13). Defendants filed a Response to the Motion ("Response," Doc. 22). Plaintiffs filed a Reply in Support of the Motion ("Reply," Doc. 23). The Court held oral argument on the Motion on October 13, 2022. On October 28, 2022, the Court entered an Order requesting supplemental briefing on certain issues. ("October 28 Order," Doc. 26). The Parties filed their supplemental briefs on November 14, 2022. ("Pls.' Supp'l Br.," Doc. 27; "Defs.' Supp'l Br.," Doc. 28). Based on the foregoing briefs and argument of counsel as well as all matters properly of record, the Court enters the following Order.

## Background

### I.     The Parties

Plaintiff New Georgia Project, Inc. ("NGP") is a nonprofit corporation that was incorporated in Delaware. (Verified Complaint ¶ 11, Doc. 1). NGP is headquartered in Georgia and registered with the Secretary of State of Georgia to conduct business as a foreign nonprofit corporation. (*Id.*). NGP is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. (*Id.* ¶ 20). NGP asserts that its major purpose

> is not the nomination or election of candidates, but rather voter registration and civic engagement. Its mission "is to build power with and increase the civic participation of the New Georgia Majority—Black, Latinx, AAPI, and young Georgians—and other historically marginalized communities through nonpartisan voter registration, organizing, and advocacy on the issues important to [its] communities.

(*Id.* ¶ 21).

Plaintiff New Georgia Project Action Fund, Inc. ("NGPAF") is a nonprofit corporation that was incorporated in Delaware. (*Id.* ¶ 12). NGPAF is headquartered in Georgia and registered with the Secretary of State of Georgia to conduct business as a foreign nonprofit corporation. (*Id.*). NGPAF is exempt from federal income taxation under section 501(c)(4) of the Internal Revenue Code. (*Id.* ¶ 22). NGPAF asserts that its major purpose "is not the nomination or election of candidates, but rather engagement in issue advocacy that increases the civic

participation of underrepresented and underserved communities of color in Georgia." (*Id.* ¶ 23).

Defendants are Christopher M. Carr, Attorney General of Georgia, as well as the Chair, Vice Chair, members, and Executive Secretary of the Georgia Government Transparency and Campaign Finance Commission ("Commission"). (*Id.* ¶¶ 13–15). The Commission was established by the Georgia Government Transparency and Campaign Finance Act (the "Act"), O.C.G.A. §§ 21-5-1 to -76.

Under the Act, members of the Commission have duties which include "mak[ing] investigations . . . with respect to the statements and reports filed under [the Act] and with respect to alleged failure to file any statements or reports required under [the Act]"; "issu[ing] orders, after the completion of appropriate proceedings, directing compliance with [the Act] or prohibiting the actual or threatened commission of any conduct constituting a violation"; and "carry[ing] out the procedures, duties, and obligations relative to the commission set forth in [the Act]." O.C.G.A. § 21-5-6(b)(9), (14), (18). Moreover, under the Act, Defendant Carr "shall, upon complaint by the [C]ommission, or may, upon [his] own initiative . . . , bring an action in the superior court in the name of the [C]ommission for a temporary restraining order or other injunctive relief or for civil penalties for a violation of any provision of [the Act]." O.C.G.A. § 21-5-6(b)(14)(C)(iii)." (*Id.* ¶ 13).

3

## II.    Relevant Provisions of the Act

This case concerns a challenge to the Commission's allegations against Plaintiffs that they failed to register and file disclosure reports as "independent committees" with respect to Georgia's 2018 statewide election and as "campaign committees" with respect to a 2019 municipal election. (Verified Compl. ¶ 34).The disclosure reports in question primarily concern what the Act defines as "contributions" and "expenditures," which the Court addresses next.

### A.    Contributions and Expenditures

Under the Act, "contribution" means

> a gift, subscription, membership, loan, forgiveness of debt, advance or deposit of money or anything of value conveyed or transferred for **the purpose of influencing** the nomination for election or election of any person for office, bringing about the recall of a public officer holding elective office or opposing the recall of a public officer holding elective office, or the influencing of voter approval or rejection of a proposed constitutional amendment, a state-wide referendum, or a proposed question which is to appear on the ballot in this state or in a county or a municipal election in this state. The term specifically shall not include the value of personal services performed by persons who serve without compensation from any source and on a voluntary basis. The term "contribution" shall include other forms of payment made to candidates for office or who hold office when such fees and compensation made can be reasonably construed as a campaign contribution designed to encourage or influence a candidate or public officer holding elective office. The term "contribution" shall also encompass transactions wherein a qualifying

4

> fee required of the candidate is furnished or paid by
> anyone other than the candidate.

O.C.G.A. § 21-5-3(7) (emphasis added). And "expenditure" means

> a purchase, payment, distribution, loan, advance,
> deposit, or any transfer of money or anything of value
> made **for the purpose of influencing** the nomination for
> election or election of any person, bringing about the
> recall of a public officer holding elective office or
> opposing the recall of a public officer holding elective
> office, or **the influencing of** voter approval or rejection
> of a proposed constitutional amendment, a state-wide
> referendum, or a proposed question which is to appear
> on the ballot in this state or in a county or a municipal
> election in this state. The term specifically shall not
> include the value of personal services performed by
> persons who serve without compensation from any
> source and on a voluntary basis. The term "expenditure"
> shall also include the payment of a qualifying fee for and
> on behalf of a candidate.

O.C.G.A. § 21-5-3(12) (emphasis added). Because "contribution" and

"expenditure" are both defined with respect to the election-related purpose of the

transaction, determining whether a given transaction qualifies as a contribution or

expenditure thus requires some determination of the knowledge and intent of the

transferor. *See Caldwell v. Bateman*, 312 S.E.2d 320, 323–24 (Ga. 1984) ("[S]hould an

employer compensate his employee for personal services rendered by the

employee to a candidate, the amount of such compensation would be a

contribution from the employer for which disclosure would be required. If an

5

employee should absent himself from his employment in order to render personal services to a candidate there would be no contribution by the employer.").

Broadly speaking, contributions are funds raised and expenditures are funds spent with respect to a given entity, though the distinction breaks down when one entity makes a "contribution" to another. *See, e.g.*, O.C.G.A. § 21-5-34(e)(2) (referring to "[p]ersons other than individuals making aggregate contributions and expenditures **to or on behalf of** candidates of $25,000.00 or less in one calendar year) (emphasis added). Understanding these basic definitions is vital to comprehending the remainder of the Act, as the Act not only uses these terms to describe what transactions a regulated entity must report, but also uses the terms to define the entities themselves. The Court next provides a brief description of these entities.

### B.   Campaign Committees and Independent Committees

The Act regulates a number of different campaign finance entities, but the relevant entities here are "campaign committees" and "independent committees."

The Act defines "[c]ampaign committee" to mean

> **the** candidate, person[1], or committee **which accepts contributions or makes expenditures designed to bring**

---

[1] Under the Act, "Person" means "an individual, partnership, committee, association, corporation, limited liability company, limited liability partnership, trust, professional corporation, or other business entity recognized in the State of Georgia, labor organization, or any other organization or group of persons." O.C.G.A. § 21-5-3(19).

about the nomination or election of an individual to any elected office. The term "campaign committee" also means any person or committee **which accepts contributions or makes expenditures designed to bring about** the recall of a public officer holding elective office or to oppose the recall of a public officer holding elective office or any person or any committee which **accepts contributions or makes expenditures designed to bring about** the approval or rejection by the voters of any proposed constitutional amendment, a state-wide referendum, or a proposed question which is to appear on the ballot in this state or in a county or a municipal election in this state.

O.C.G.A. § 21-5-3(2) (emphasis added).

As the Court has emphasized in the above block quote, a "campaign committee" is defined by reference to an entity's acceptance of contributions or making of expenditures. The term also creates an internal distinction between three types of campaign committees: those "designed to bring about" the election or nomination of a candidate (which the Court will refer to as "candidate committees"), those "designed to bring about" or to oppose the recall of a public official (which the Court will refer to as "recall committees"), and those "designed to bring about" the approval or rejection of a ballot measure (which the Court will refer to as "ballot committees").

While candidate committees, recall committees, and ballot committees are all broadly "campaign committees," the Act treats the three distinctly in several places. Most importantly, candidate committees are subject to contribution limits.

7

O.C.G.A. §§ 21-5-41, 21-5-42. Another distinction is that the Act provides differing timelines for filing disclosure reports based on which type of campaign committee the entity is. O.C.G.A. § 21-5-34(c) (candidate committees), (g) (recall committees), (h) (ballot committees). Lastly, ballot committees that raise $500 or less in contributions or make $500 or less in expenditures need not file disclosure reports. O.C.G.A. § 21-5-34(a)(2)(A).

The disclosure reports that campaign committees are required to file must include the following information:

> (A) As to any contribution of more than $100.00, its amount and date of receipt, the election for which the contribution has been accepted and allocated, along with the name and mailing address of the contributor, and, if the contributor is an individual, that individual's occupation and the name of his or her employer. Such contributions shall include, but shall not be limited to, the purchase of tickets for events such as dinners, luncheons, rallies, and similar fund-raising events coordinated for the purpose of raising campaign contributions for the reporting person;

> (B) As to any expenditure of more than $100.00, its amount and date of expenditure, the name and mailing address of the recipient receiving the expenditure, and, if that recipient is an individual, that individual's occupation and the name of his or her employer and the general purpose of the expenditure;

> (C) When a contribution consists of a loan, advance, or other extension of credit, the report shall also contain the name of the lending institution or party making the advance or extension of credit and the names, mailing addresses, occupations, and places of employment of all

persons having any liability for repayment of the loan, advance, or extension of credit; and, if any such persons shall have a fiduciary relationship to the lending institution or party making the advance or extension of credit, the report shall specify such relationship;

. . .

(E) The corporate, labor union, or other affiliation of any political action committee or independent committee making a contribution of more than $100.00;

(F) Any investment made with funds of a campaign committee, independent committee, or political action committee and held outside such committee's official depository account during each reporting period for which an investment exists or a transaction applying to an identifiable investment is made. The report shall identify the name of the entity or person with whom such investment was made, the initial and any subsequent amount of such investment if such investment was made during the reporting period, and any profit or loss from the sale of such investment which occurred during such reporting period; and

(G) Total debt owed on the last day of the reporting period.

O.C.G.A. § 21-5-34(b)(1).

In addition to campaign committees, the Act also regulates "independent committees." The Act defines "[i]ndependent committee" as

any committee, club, association, partnership, corporation, labor union, or other group of persons, **other than a campaign committee**, political party, or political action committee, **which receives donations** during a calendar year from persons who are members or supporters of the committee and **which expends such funds either for the purpose of affecting** the outcome of

> an election for any elected office **or to advocate the election or defeat** of any particular candidate.

O.C.G.A. § 21-5-3(15) (emphasis added). The most important distinction between candidate committees and independent committees is that the latter have no restrictions on the amount of funds they raise or how they use them, provided they do not coordinate with candidates or their campaign committee. O.C.G.A § 21-5-41(a); Ga. Comp. R. & Regs. 189-6-.04.

The first criterion for an independent committee is that it cannot be a campaign committee. Moreover, an individual cannot be an independent committee, though a group of individuals can be. *See* Gov. Transparency & Campaign Finance Comm'n Advisory Op. No. 2008-04. Instead of being treated as independent committees, individuals who make expenditures in support of a candidate are deemed to be contributing to the candidate, and need only register with and report to the commission if such individual's aggregate contributions to candidates or their committees exceeds $25,000 in a calendar year. *Fortson v. Weeks*, 208 S.E.2d 68, 75–76 (Ga. 1974); O.C.G.A. § 21-5-34(e)(1). This $25,000 exemption also applies to other persons, such as corporations. O.C.G.A. § 21-5-34(e)(2).[2]

---

[2] The Parties, in their respective supplemental briefs, agree that this exemption does not apply to independent committees. (Pls.' Supp'l Br., Doc. 27; Defs.' Supp'l Br., Doc. 28).

Next, independent committees need only receive donations from their members or supporters—the funds that they receive do not need to constitute "contributions" under the Act. Finally, unlike the definition of "campaign committee," the definition of "independent committee" does not refer to an entity that "makes expenditures," but instead applies to an entity "which expends such funds either for the purpose of affecting the outcome of an election for any elected office or to advocate the election or defeat of any particular candidate." *Id.* The Commission has clarified that this definition adopts an express advocacy standard. Ga. Gov. Transparency & Campaign Finance Comm'n Advisory Op. No. 2001-32.

Under the Act, an independent committee "shall file a registration in the same manner as is required of campaign committees prior to accepting or making contributions or expenditures." O.C.G.A. § 21-5-34(e).[3] Similarly, an "independent committee which accepts contributions or makes expenditures for the purpose of affecting the outcome of an election or advocates the election or defeat of any candidate" must register with the commission and must file reports containing

> (A) The amount and date of receipt, along with the name, mailing address, occupation, and employer of any person making a contribution of more than $100.00;

---

[3] But an entity is only an "independent committee" once it "expends . . . funds," O.C.G.A. § 21-5-3(15), so this creates a chicken and egg problem.

(B) The name, mailing address, occupation, and employer of any person to whom an expenditure or provision of goods or services of the value of more than $100.00 is made and the amount, date, and general purpose thereof, including the name of the candidate or candidates, if any, on behalf of whom, or in support of or in opposition to whom, the expenditure or provision was made;

. . . [and]

(D) The corporate, labor union, or other affiliation of any political action committee, candidate, campaign committee, or independent committee making a contribution of the value of more than $100.00.

O.C.G.A. § 21-5-34(f)(1), (2).

Lastly, "[w]henever any independent committee makes an expenditure for the purpose of financing any communication intended to affect the outcome of an election,[4] such communication shall clearly state that it has been financed by such independent committee." O.C.G.A. § 21-5-34(f)(3).

## III.   Factual Background

In September 2019, the Commission's staff filed identical complaints against Plaintiffs before the Commission pursuant to O.C.G.A. § 21-5-7, alleging that they failed to register and report as independent committees with respect to Georgia's 2018 statewide election and as campaign committees with respect to a 2019

---

[4] "Election" means "a primary election; run-off election, either primary or general; special election; or general election. The term 'election' also means a recall election." O.C.G.A. § 21-5-3(9).

municipal election. (Compl. ¶ 34, Doc. 1; Resp. F., Doc. 22-6 at 2). Plaintiffs responded to the complaints and requested that the Commission immediately vote to dismiss, in part because the complaints did not allege that either Plaintiffs' major purpose is the nomination or election of candidates. (Compl. ¶ 35). On June 17, 2022, the Commission filed a single amended complaint against Plaintiffs that essentially made the same allegations as the September 2019 complaints. Plaintiffs again requested that the Commission immediately vote to dismiss. (*Id.* ¶ 36). On August 1, 2022, the Commission denied Plaintiffs' motion to dismiss and voted to find reasonable grounds that Plaintiffs violated the law by failing to register and report as committees. (*Id.* ¶ 37). Plaintiffs commenced this civil action on August 31, 2022 (Doc. 1) and filed the instant Motion on September 8, 2022. (Doc. 13).

On September 21, 2022, after the filing of Plaintiffs' Complaint and Motion, the Commission filed a complaint in the Georgia Office of State Administrative Hearings ("OSAH"), alleging that Plaintiffs violated Georgia law by failing to register as either a campaign or independent committee in 2018 and 2019 and file the required disclosure reports.[5] (Defs.' Resp. Ex. F at 205–210, Doc. 22-6). The

---

[5] Under O.C.G.A. § 50-13-41, "[w]henever a state agency authorized by law to determine contested cases initiates or receives a request for a hearing in a contested case which is not presided over by the agency head or board or body which is the ultimate decision maker, the hearing shall be conducted by the Office of State Administrative Hearings, and such hearings shall be conducted in accordance with the provisions of this chapter and the rules and regulations promulgated under this article."

13

Commission asked that the Plaintiffs be required to register as a committee and file disclosure reports for the relevant periods of 2018 and 2019, cease and desist from further violation of the Act, and be required to pay civil penalties. (*Id.* at 210-11).

## Legal Standard

A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A district court has broad discretion to grant injunctive relief if the movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). The third and fourth factors "'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## Discussion

The Court first discusses Defendants' request for abstention under *Younger v. Harris*, 401 U.S. 37 (1971). The Court then considers Plaintiffs' request for a preliminary injunction against Defendants' enforcement of the Act.

## I.  *Younger* Abstention

As an initial matter, Defendants argue this Court should abstain from hearing this case in favor of the OSAH complaint initiated on September 21, 2022.

The *Younger* abstention doctrine originates from the Supreme Court's holding in *Younger v. Harris*. 401 U.S. at 37. "In *Younger*, the Supreme Court held that, under 'the basic doctrine of equity jurisprudence,' federal courts should not act to restrain ongoing criminal prosecutions in state courts, provided that 'the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' *Greene v. Raffensperger,* --- F. Supp. 3d. ----, 2022 WL 1136729, at *10 (2022) (quoting *Younger*, 401 U.S. at 43–44). "This principle of equitable restraint serves the interest of 'avoid[ing] a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted.'" *Id.* (quoting *Younger*, 401 U.S. at 44).

> As the Supreme Court explained in *Younger*, the rationale for restraining courts of equity from interfering with ongoing criminal prosecutions is also reinforced by a consideration of comity, that is:

> 'a proper respect for state functions, a recognition of the
> fact that the entire country is made up of a Union of
> separate state governments, and a continuance of the
> belief that the National Government will fare best if the
> States and their institutions are left free to perform their
> separate functions in their separate ways.'

*Id.* (quoting *Younger*, 401 U.S. at 44). "This concept, which 'is referred to by many

as 'Our Federalism,' . . . does not mean blind deference to 'States' Rights' any more

than it means centralization of control over every important issue in our National

Government and its courts."' *Greene,* 2022 WL 1136729, at *10 (quoting *Younger*,

401 U.S. at 44).

"Because the same concern for 'comity and federalism' is 'equally applicable

to certain other pending state proceedings,' the Supreme Court extended the

*Younger* abstention doctrine to other types of state civil proceedings 'in which

important state interests are involved.'" *Id.* (quoting *Ohio C.R. Comm'n v. Dayton

Christian Sch., Inc.*, 477 U.S. 619, 627 (1986)). "Despite this prior extension, the

Supreme Court has more recently narrowed *Younger's* domain, cautioning that

'[a]bstention is not in order simply because a pending state-court proceeding

involves the same subject matter.'" *Id.* (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571

U.S. 69, 72 (2013)). "Rather, circumstances fitting within the *Younger* doctrine are

'exceptional' and only apply to the three specific categories of state proceedings

identified in *Sprint*: (1) 'state criminal prosecutions,' (2) 'civil enforcement

proceedings' akin to criminal prosecutions, and (3) 'civil proceedings involving

16

certain orders that are uniquely in furtherance of the state court's ability to perform their judicial functions.'" *Greene,* 2022 WL 1136729, at *10 (quoting *Sprint,* 571 U.S. at 73). "In *Sprint,* the Supreme Court emphasized that, 'a federal court's 'obligation to hear and decide a case is virtually unflagging,' and '[p]arallel state-court proceedings do not detract from that obligation.'" *Id.* (quoting 571 U.S. at 77).

"After a federal court finds that state-court proceedings fall into one of these three exceptional categories, and only after that determination, 'additional factors' must be considered by the federal court to determine whether abstention is appropriate. *Id.* at *11 (citing *Barone v. Wells Fargo Bank, N.A.,* 709 F. App'x 943, 948 (11th Cir. 2017)). "The federal court must apply the '*Middlesex* factors' and consider whether the state proceeding (1) constitutes an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity to raise federal challenges. *Id.* (citing *Barone,* 709 F. App'x at 948; *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982)).

"When all three *Middlesex* factors are satisfied, a federal court should abstain from interfering with ongoing state proceedings absent a showing that (1) the state proceeding was initiated in bad faith or for the purpose of harassment; (2) the challenged statute is 'flagrantly and patently unconstitutional;' or (3) other

17

extraordinary circumstances render abstention inappropriate." *Id.* (quoting *Middlesex*, 457 U.S. at 437).

Importantly, prior to applying this framework, the Court must find that a state court proceeding is "ongoing." Under Eleventh Circuit authority, "a state proceeding is considered 'ongoing' for *Younger* purposes in two circumstances. First, a state proceeding is 'ongoing' if it was pending at the time the federal suit was filed." *Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga.*, 940 F.3d 1254, 1268 (11th Cir. 2019) (citing *Jones v. Wade*, 479 F.2d 1176, 1181 n.6 (5th Cir. 1973)). "Second, even if a state proceeding began after the filing of a federal suit, the state proceeding is still 'ongoing' if 'the state [proceeding] commenced before any proceedings of substance on the merits have taken place in the federal court.'" *Id.* (quoting *For Your Eyes Alone, Inc. v. City of Columbus, Ga.*, 281 F.3d 1209, 1217 (11th Cir. 2002)). Where a state proceeding is commenced after the filing of the federal lawsuit, this Court has discretion "to abstain if the state criminal prosecution commenced 'before any proceedings of substance on the merits have taken place in the federal court,', or if 'the federal litigation [is] in an embryonic stage and no contested matter [has] been decided.'" *For Your Eyes Alone*, 281 F.3d at 1217 (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975) and *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975), respectively) (alterations in original).

Two Supreme Court cases provide some guidance here. "In *Hicks,* state criminal proceedings commenced one day after service of the federal complaint." *For Your Eyes Alone*, 281 F.3d at 1218 (citing *Hicks*, 422 U.S. at 349). "The state prosecution therefore was instituted even before the state had answered the federal complaint, as well as before any proceedings whatsoever were conducted before the three-judge court convened for that case." *Id.* (citing *Hicks*, 422 U.S. at 350). "In addition, prior to filing of the federal complaint, films of the plaintiffs already had been deemed obscene and seizable in a proceeding before the state superior court, and the plaintiffs had made an appearance at the hearing and were given an opportunity to participate therein." *Id.* (citing *Hicks*, 422 U.S. at 335–36). "Similarly, in *Doran,* the state criminal prosecution was commenced only one day after the filing of the federal complaint." *Id.* (citing *Doran*, 422 U.S. at 925). "The plaintiffs' TRO motion had been denied instanter by the district court on the same day the federal complaint was filed." *Id. (*citing *Doran*, 422 U.S. at 925).

The Eleventh Circuit has also considered when state court proceedings are ongoing for the purpose of the doctrine. In *For Your Eyes Alone*, "the City commenced [a] prosecution only after it had begun actively litigating its position in federal court; by the time the City commenced the prosecution, the City had filed its answer, and the City had moved on various grounds for dismissal of the complaint and for summary judgment." *Id.* Similarly, in *Tokyo Gwinnett,* the

plaintiff filed the "federal action on July 22, 2015, and first moved to amend its complaint to add claims relating to the current ordinances on December 17, 2015. The County did not file the state-court enforcement action until July 8, 2016—nearly a year after [the plaintiff] filed its action." 940 F.3d at 1270.

The Court now turns to this case. The Complaint was filed on August 31, 2022. (Doc. 1). Plaintiffs' Motion was filed on September 8, 2022. (Doc. 13). Plaintiffs' counsel submitted pro hac vice applications on September 1, which were approved on September 8, 9, and 16, 2022. (Docs. 14, 15, 20). Plaintiff filed service waivers by Defendants on September 9, 2022 and September 13. (Docs. 17, 19). As noted above, the OSAH complaint was instituted on September 21, 2022, and Defendants filed their Response on September 22, 2022. (Doc. 22). The Court set this matter for hearing on September 23, 2022.

There appears to be no dispute that the OSAH proceeding itself is akin to a criminal prosecution. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). However, Defendants assert that prior to the initiation of the OSAH proceeding, the Commission was engaged in an investigation of Plaintiffs, and the Commission found reasonable grounds to continue with its enforcement action on August 4, 2022, referring the matter to the Attorney General. (Resp. at 12–13, Doc. 22). But, as Plaintiffs point out, and the Court agrees, the proceedings before the Commission were not "judicial in nature." *Dayton Christian Sch.*, 477 U.S. at 627;

20

*see* O.C.G.A. § 21-5-6(b)(10)(B) ("In any such preliminary investigation referenced in subparagraph (A) of this paragraph, until such time as the commission determines that there are reasonable grounds to believe that a violation has occurred, it shall not be necessary to give the notice by summons nor to conduct a hearing in accordance with Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act'"). And Plaintiffs should not be faulted for attempting to resolve the matter before the Commission prior to resorting to litigation.

This case certainly does not present the same facts as *Hicks*, where state criminal proceedings were commenced one day after service of the federal complaint. 422 U.S. at 349. But it is also not so extreme as *Tokyo Gwinnett*, which involved enforcement nearly a year later. 940 F.3d at 1270. The Court does not glean from reviewing all of these cases a per se rule about how many days or motions are too many; instead, it appears to be a case-by-case determination. And, where the Court decides to retain the matter, rather than abstain, the Court must have some discretion to determine when, in light of its experience managing cases, it is too late. *Tokyo Gwinnett*, 940 F.3d at 1266 ("This Court reviews a district court's decision to abstain for abuse of discretion.").

Here, the Court finds that the OSAH proceeding is not "ongoing" for the purpose of *Younger*. The facts in this case do not seem to present a scenario where the Parties were racing to the courthouse. Instead, the OSAH proceeding was

21

instituted the day before Defendants filed their Response, which bears the hallmarks of an attempt to shore up Defendants' litigation position in anticipation of filing a response, after Plaintiffs had gone through the time and expense of drafting the Motion and supporting brief and securing service waivers. *Cf. For Your Eyes Alone*, 281 F.3d at 1219 ("[I]f we define too narrowly what constitutes proceedings of substance on the merits, we risk 'vest[ing] the district attorney—not the aggrieved citizen—with the power to choose the forum, and, indeed, the nature of the proceeding in which the federal constitutional claim [will] be litigated.' . . . Indeed, we would risk creating an expansive "reverse removal power" in that state prosecutors, in effect, would have broad discretion to remove federal civil rights actions to state criminal court on a routine basis, even after the plaintiff had invested precious time and resources to bringing the federal litigation.") (quoting Owen M. Fiss, *Dombrowski*, 86 YALE L.J. 1103, 1135–36 (1977) and citing ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 13.3, at 788 (3d ed. 1999)).

Moreover, the Eleventh Circuit has also noted "concern over the costs of abstention in a suit where the plaintiff brings a facial or as-applied challenge to a state statute on First Amendment free speech grounds," as Plaintiffs have done here. *Id.* ("Uncertainty as to the constitutionality of the statute at issue, or as to the conduct of the state agents implementing the statute, can in itself chill future speech.").

Accordingly, the Court finds that the OSAH proceeding was not "ongoing" for the purpose of *Younger*, and that doctrine does not apply. The Court turns next to the merits of the Motion.

## II.   Preliminary Injunction

Plaintiffs challenge the Act's definition of "campaign committee" and "independent committee," and more specifically the compelled disclosure requirements attendant to entities so designated, on the grounds that they violate the First and Fourteenth Amendments to the U.S. Constitution, both facially and as applied to Plaintiffs in particular.

First Amendment challenges to compelled disclosure requirements are reviewed under the "exacting scrutiny" standard. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (citing *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). "Under that standard, there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Reed*, 561 U.S. at 196).

"While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.* "Narrow tailoring is

crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* at 2384 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). More specifically, the Supreme Court has often recognized the "deterrent effect on the exercise of First Amendment rights" that arises as an "inevitable result of the government's conduct in requiring disclosure." *Id.* at 2383 (quoting *Buckley*, 424 U.S. at 65).

"Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Id.* at 2387 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008), respectively). "In the First Amendment context, however," the Supreme Court has "recognized 'a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). In the context of compelled disclosure, the Supreme Court has tied this analysis to the narrow tailoring aspect of the exacting scrutiny standard. *Id.* ("The lack of tailoring to the State's investigative goals is categorical—present in every case—as is the weakness of the State's interest in administrative convenience. Every demand that might chill association therefore fails exacting scrutiny.").

24

## A.      Government's Interest

As the Supreme Court has recognized on multiple occasions in the campaign-finance context, compelled disclosure regimes may "be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." *Citizens United v. FEC*, 558 U.S. 310, 367 (2010) (quoting *Buckley*, 424 U.S. at 66); *accord McConnell v. FEC*, 540 U.S. 93, 196, 197 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. at 310 (holding that disclosure requirements would help voters "make informed choices in the political marketplace").

Plaintiffs do not specifically challenge the State of Georgia's interest in campaign finance disclosure requirements in general. (*Cf.* Pl.'s Br. Supp. Motion at 6, Doc. 13-1) ("In *Buckley*, the Supreme Court addressed federal disclosure requirements that were very similar to those in the Georgia Act . . . The Supreme Court acknowledged that these requirements served several substantial government interests.") (citing *Buckley*, 424 U.S. at 66–68). Instead, they contend that the Act sweeps too broadly in encompassing speech by organizations that are not under the control of a candidate and, more specifically, organizations which do not have the major purpose of the nomination or election of a candidate. (*Id.* (citing *Buckley*, 424 U.S. at 79)). The State responds that the major purpose test is

25

not a constitutional requirement. (Resp. at 20). The Court addresses this argument in the following section.

### B. Narrow Tailoring

Plaintiffs assert that the Act's disclosure provisions are overbroad and insufficiently tailored to the government's interest in disclosure because they apply to any organization that receives contributions or makes expenditures regardless of amount, even if doing so is not the major purpose of the organization. (Br. Supp. Mot. at 1, Doc. 13-1).

The term "major purpose" arises from the Supreme Court's decision in *Buckley v. Valeo*, which interpreted similar disclosure provisions in the Federal Election Campaign Act of 1971 ("FECA") to only apply to organizations "under the control of a candidate or the major purpose of which is the nomination or election of a candidate."[6] 424 U.S. 1, 79 (1976). In an extensive opinion, the Court liberally employed the constitutional avoidance canon to sustain portions of FECA in light of First Amendment challenges. *Id.* at 77–78 ("Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, if that can be done consistent with the legislature's purpose, to avoid

---

[6] *Buckley* is also notable for its discussion of why "exacting scrutiny" applies to a campaign finance regulation which compels disclosure. 424 U.S. at 66.

the shoals of vagueness.") (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954);

*United States v. Rumely*, 345 U.S. 41, 43 (1953)).

    For example, FECA Section 608(e)(1) provided that "(n)o person may make

any expenditure . . . relative to a clearly identified candidate during a calendar

year which, when added to all other expenditures made by such person during

the year advocating the election or defeat of such candidate, exceeds $1,000." *Id.* at

39 (quoting 18 U.S.C. 608(e)(1) (1976)). The D.C. Circuit, recognizing the

indefiniteness of the phrase "relative to," construed "'relative to" a candidate to

mean "advocating the election or defeat of a candidate." *Id.* at 42, 42 n.49. "But,"

the Supreme Court wrote, "while such a construction of s 608(e)(1) refocuses the

vagueness question, the Court of Appeals was mistaken in thinking that this

construction eliminates the problem of unconstitutional vagueness altogether,"

because "the distinction between discussion of issues and candidates and

advocacy of election or defeat of candidates may often dissolve in practical

application." *Id.* at 42. Instead, the Court held that constitutional issues could only

be avoided by reading the statute "as limited to communications that include

explicit words of advocacy of election or defeat of a candidate." *Id.* at 43. This

ruling would later lead to what has come to be termed the express advocacy/issue

advocacy distinction in First Amendment law. Anthony Corrado, *On the Issue of

Issue Advocacy: A Comment*, 85 VA. L. REV. 1803, 1804 (1999).

Later in the opinion, the Court would revisit this vagueness analysis in the context of the term "political committee." At the time, FECA Section 431(d) defined "political committee" quite similarly to how Georgia law defines campaign committee: "any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000." *Buckley*, 424 U.S. at 79 n.105. Likewise, "contributions" and "expenditures" were defined "in terms of the use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office." *Id.* at 77 (quoting 2 U.S.C. § 431(e), (f) (1976)).

The Court expressed concern that "'for the purpose of . . . influencing' an election or nomination, [while] differ[ing] from the ["related to"] language used in s 608(e)(1), . . . shares the same potential for encompassing both issue discussion and advocacy of a political result." *Id.* at 79. This was problematic in light of "[t]he general requirement that 'political committees' and candidates disclose their expenditures" because "'political committee' is defined only in terms of amount of annual 'contributions' and 'expenditures,' and could be interpreted to reach groups engaged purely in issue discussion." *Id.*

Although the Court squarely framed the problem, its solution is a bit more difficult to parse. The Court began by noting that "[t]o fulfill the purposes of the

Act," the compelled disclosure requirements "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* "Expenditures of candidates and of 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress," the Court wrote, because "[t]hey are, by definition, campaign related." *Id.*

On the other hand, "when the maker of the expenditure is not within these categories when it is an individual other than a candidate or a group other than a 'political committee'—the relation of the information sought to the purposes of the Act may be too remote." *Buckley*, 424 U.S. at 79–80. To avoid this problem, the Court again adopted an "express advocacy" construction, this time for the vague phrase "for the purpose of . . . influencing." So construed, FECA

> imposes independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate."

*Id.* at 80. Having so construed the terms "contribution" and "expenditure," the Court found that FECA's disclosure requirements for political committees passed exacting scrutiny. *Id.* at 80–81.

By focusing on an entity's "major purpose" and limiting the definition of "expenditure," the Court sought to balance FECA's goals with avoiding a potential violation of the First Amendment. However, since then, courts have struggled to grasp whether *Buckley* announced a constitutional principle or simply interpreted FECA. This has led to a circuit split. *Compare N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 288 (4th Cir. 2008), *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 872 (8th Cir. 2012), *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 675–79 (10th Cir. 2010), *with Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 58–59 (1st Cir. 2011),[7] *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 136 (2d Cir. 2014), *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 490 (7th Cir. 2012), *and Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1008–11 (9th Cir. 2010).

The Seventh Circuit has considered the issue in depth in two opinions, *Center for Individual Freedom v. Madigan*, 697 F.3d at 490 and *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 839 (7th Cir. 2014).

In *Madigan*, the plaintiff challenged as vague and overbroad an Illinois law that required "outside groups . . . to register as political committees if within a 12–

---

[7] The Eleventh Circuit, in an unpublished, per curiam decision, affirmed a decision "for the reasons that the First Circuit in *National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011), cert. denied, ––– U.S. ––––, 132 S. Ct. 1635, 182 L.Ed.2d 233 (2012), rejected the same challenges." *Nat'l Org. for Marriage Inc. v. Sec'y, State of Fla.*, 477 F. App'x 584, 585 (11th Cir. 2012). In that case, however, "Plaintiff was not challenging the disclosure requirements" on appeal. *Id.* at 585 n.2.

month period they make or receive more than $3,000 worth of contributions, expenditures, or independent expenditures for electioneering communications," because it did not contain a major purpose limitation. 697 F.3d at 486 (citing 10 ILCS 5/9–1.8, 5/9–8.6(b)). The Seventh Circuit wrote that this "argument reads *Buckley* too broadly" because "the 'major purpose' limitation . . . was a creature of statutory interpretation, not constitutional command." *Id.* at 487 (citing *McKee*, 649 F.3d at 59). "*Buckley*'s limiting construction was drawn for the statute before it," the court wrote, "and the Supreme Court has never applied a 'major purpose' test to a state's regulation of political committees." *Id.* at 487–88 (citing *McKee*, 649 F.3d at 59). Moreover, the court refused to impose a major purpose limitation for four reasons: (a) because the burdens on being defined as a political committee under *Buckley* were much greater than those under Illinois law, (b) because Illinois law already defined political committees more narrowly than FECA by requiring contributions or expenditures be made "on behalf of or in opposition to" a candidate or ballot initiative," (c) because it would yield perverse results, regulating smaller groups more heavily than larger ones, and (d) because the test would permit groups to avoid regulation by diluting their election purposes with non-election purposes. *Id.* at 488–89. In a footnote, the court also noted that "[t]he [Federal Election Commission ("FEC")] . . . applies the 'major purpose' test on a 'case-by-case' basis, and in practice the test appears to be quite complex." *Id.* at 489

31

n.26 (citing *The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 545–46 (4th Cir. 2012) and *Shays v. FEC*, 511 F. Supp. 2d 19, 31 (D.D.C. 2007)). The court went on to determine that the Illinois law satisfied exacting scrutiny. *Id.* at 490–91.

Two years later, the Seventh Circuit revisited the issue in *Barland*, this time addressing a Wisconsin law which regulated "independent disbursements (expenditures made independently of candidates and their campaign committees)." 751 F.3d at 814. The law defined "disbursement" as a "purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value [except a loan from a commercial lending institution] . . . , [or a 'contract, promise, or agreement' to do any of these things] made for political purposes." *Id.* at 815 n.5 (quoting Wis. Stat. § 11.01(7)(a)) (alterations in original). Under the Wisconsin regulation at issue, "any organization that makes 'independent disbursements' is required to comply with almost all of the statutory obligations imposed on political committees." *Id.* at 839.

The *Barland* court began by explaining that "outside groups—even those whose major purpose is not express advocacy—are not completely immune from disclosure and disclaimer rules for their occasional spending on express election advocacy" though "the Court has never endorsed imposing full, formal PAC-like burdens on these speakers." *Id.* It reiterated its holding in *Madigan* that the "'major purpose' limitation, like the express-advocacy/issue-discussion distinction, was a

creature of statutory interpretation, not constitutional command." *Id.* at 839 (citing *Madigan*, 697 F.3d at 487). The state election board took that holding "to mean that the so-called 'major purpose test' in campaign-finance law no longer exists," which the court of appeals flatly rejected as "incorrect." *Id.* The court emphasized that "[t]he major-purpose limitation announced in *Buckley* has not receded from the scene. It continues in force and effect as an important check against regulatory overreach and becomes more significant as the scope and burdens of the regulatory system increase." *Id.*

Then, applying exacting scrutiny, the Seventh Circuit acknowledged the governmental interest in disclosure but found "'a substantial mismatch' between that informational objective and the means the Board has chosen to achieve it.'" *Id.* at 841 (quoting *McCutcheon v. FEC*, 572 U.S. at 217). Under the Wisconsin law, "every independent group that crosses the very low $300 threshold in express-advocacy spending must formally organize, register, and report like a political committee," which the court described as "heavy administrative burdens, creating disincentives to participation in election-related speech." *Id.* at 840–41. Instead, the Court suggested "[a] simpler, less burdensome disclosure rule for occasional express-advocacy spending by 'nonmajor-purpose groups'" such as the "one-time, event-driven disclosure requirement for . . . . broadcast ads in excess of

$10,000 aired close to an election." *Id.* at 841 (citing *Citizens United*, 558 U.S. at 366–69).

In sum, the "major purpose" test, while it may have taken on a life of its own, is at its core an expression of the importance of carefully scrutinizing disclosure regulations under exacting scrutiny in light of the government's proffered interest. *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 393 (D.C. Cir. 1981) ("[T]hese decisions recognized the grave constitutional difficulties inherent in construing the term 'political committee' to include groups whose activities are not under the control of a 'candidate,' or directly related to promoting or defeating a clearly identified 'candidate' for federal office."). With this in mind, the Court turns to the Georgia Act's definitions of "candidate committee" and "independent committee."

### i.    Campaign Committees

The Court begins with the definition of campaign committees. As a reminder, the Act essentially defines three types of campaign committees: candidate committees "which accept[] contributions or make[] expenditures designed to bring about the nomination or election of an individual to any elected office," recall committees "which accept[] contributions or make[] expenditures designed to bring about the recall of a public officer holding elective office or to oppose the recall of a public officer holding elective office" and ballot committees

"which accept[] contributions or make[] expenditures designed to bring about the approval or rejection by the voters of any proposed constitutional amendment, a state-wide referendum, or a proposed question which is to appear on the ballot in this state or in a county or a municipal election in this state." O.C.G.A. § 21-5-3(2). "Contribution" and "expenditure" both refer essentially to "any transfer of money or anything of value made for the purpose of influencing the nomination for election or election of any person, bringing about the recall of a public officer holding elective office or opposing the recall of a public officer holding elective office, or the influencing of voter approval or rejection of [a ballot measure]." O.C.G.A. § 21-5-3(7), (12).

Plaintiffs assert that this definition is unconstitutionally overbroad because it encompasses organizations which do not have the major purpose of electioneering. While the Plaintiffs challenge all aspects of the definition of campaign committees, the only type of campaign committees at issue in this case are ballot committees. Before addressing the constitutionality of the Act's definition of campaign committees, the Court must determine whether the Act can be interpreted to avoid a constitutional issue.

The Court is cognizant that "federal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988) (citing

*Grayned v. Rockford*, 408 U.S. 104, 110 (1972) and *Gooding v. Wilson*, 405 U.S. 518, 520–21 (1972)). Further, under Georgia law, "[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." O.C.G.A. § 1-3-1(a). As the Georgia Court of Appeals has recognized, "[t]he election law is in derogation of the common law and must be strictly construed." *State Ethics Comm'r v. Moore*, 447 S.E.2d 687, 689 (Ga. Ct. App. 1994) (quoting *Schloth v. Smith*, 215 S.E.2d 292 (Ga. Ct. App. 1975)). "Moreover, when a statute imposes a fine or penalty, strict construction is required in favor of the person penalized." *Id.* When interpreting a predecessor version of the Act, the Georgia Court of Appeals has explained that isolated code sections "must be read in pari materia" with the other provisions of the Act. *Id.* Both Defendant Carr's predecessor and the Georgia Supreme Court have also recognized that the Act must be construed in accordance with the U.S. Constitution, including the Supreme Court's decision in *Buckley*:

> Given the above and foregoing developments in the law, it is clear that Georgia law must be interpreted and applied by the State Ethics Commission in accordance not only with the statutes enacted by the General Assembly but also in harmony with the requirements of the federal constitution. This means that the terms "contribution" and "expenditure" must be interpreted and applied as outlined in *Buckley* and its progeny, and as recognized by the Supreme Court of Georgia in the aforementioned cases.

1995 Ga. Op. Att'y Gen. 67 (No. 95-26), 1995 WL 377736 (citing *Fortson v. Weeks*, 208 S.E.2d 68, 75–76 (Ga. 1974)). As the Georgia Supreme Court recognized in *Fortson*, "activities in the exercise of First Amendment freedoms may not be harshly channeled and controlled simply by being deemed 'contributions,' for these activities are constitutionally protected from significant legislative chilling." 208 S.E.2d at 75-76 (construing definition of "contribution" in predecessor act to provide that financial outlays by persons in the course of the exercise of First Amendment rights are not in violation of the act).

In the October 28 Order, the Court asked the Parties to brief whether the definition of "campaign committee" could be construed to provide for a statutory major purpose limitation. (Doc. 26).[8] However, both Plaintiffs and Defendants

---

[8] The Court pointed the Parties to an advisory opinion issued by Defendant Carr's predecessor addressing a ballot committee, the same type of campaign committee that Defendants assert one or more Plaintiffs constituted:

> You have suggested that a political body which contributes to a campaign committee designed to oppose a local referendum may itself become a "campaign committee" as defined by the Act. I do not believe the current language contained in the Act supports such a conclusion. **O.C.G.A. § 21–5–34(a)(2) requires contributor and expenditure disclosures for those campaign committees which are formed for the express purpose of supporting or defeating a local ballot question**. There is nothing in that Code section or in O.C.G.A. § 21–5–31 which also requires contributors to these committees to make such disclosures. A contributor to a campaign committee does not by making

declined to embrace such an interpretation in response to the Court's October 28

Order. (Pls.' Supp'l Br., Doc. 27; Defs.' Supp'l Br., Doc. 28). Moreover, Defendants

pointed to State Ethics Commission Advisory Opinion 2010-02, where the

Commission expressly declined to interpret the Act to provide for a major purpose

limitation. (Doc. 28-1, at 3). Pursuant to O.C.G.A. § 21-5-6(13), the Commission has

the power and duty "[t]o issue, upon written request, and publish in print or

electronically written advisory opinions on the requirements of this chapter, based

on a real or hypothetical set of circumstances." Under that provision, "[n]o liability

shall be imposed under this chapter for any act or omission made in conformity

with a written advisory opinion issued by the commission that is valid at the time

---

such contribution become transformed into another "campaign committee" as defined by O.C.G.A. § 21–5–3(2). If the General Assembly desires to require such additional disclosures, it could extend O.C.G.A. § 21–5–31 to require the report of contributions made to campaign committees as well as those made to candidates.

**Therefore, it is my unofficial opinion that the Ethics in Government Act requires a campaign committee formed for the purpose of opposing a local option sales tax referendum to file a campaign contribution disclosure report**; however, the Act does not compel each contributor to such a committee to file a separate disclosure report.

1994 Ga. Op. Att'y Gen. 64 (No. U94-2), 1994 WL 32769 (emphasis added).

of the act or omission." O.C.G.A. § 21-5-6(13). The Eleventh Circuit requires substantial deference to a state agency's interpretation of a statute the agency administers, and the agency's interpretation cannot be set aside "unless it is arbitrary, capricious, an abuse of discretion, or otherwise not supported by law." *Pharm. Research & Mfrs. of Am. v. Meadows*, 304 F.3d 1197, 1208 (11th Cir. 2002). The Court finds that the Commission's interpretation is a reasonable reading of the statute, and therefore is entitled to deference.

Constrained by such an interpretation, the Court finds that the Act's definition of campaign committee is unconstitutional solely as applied to ballot committees, for the reasons that follow. The Court declines to address whether the Act's definition of campaign committee is unconstitutional as applied to candidate committees or recall committees because Defendants have not asserted that Plaintiffs are those types of campaign committees. *See Fortson*, 208 S.E.2d at 72 (severing unconstitutional provisions from predecessor to Act).

The Act's treatment of ballot committees differs from the treatment of candidate committees in a number of ways, ostensibly because a candidate is a singular human being which can be ultimately accountable, while a ballot initiative may or may not have a sponsor. This difference in treatment manifests in several ways. For example, as the Commission has recognized, fairly interpreted, the Act permits only one campaign committee per candidate. Ga. Gov.

Transparency & Campaign Finance Comm'n Advisory Op. No. 2017-05 at 7 (Def.'s Supp'l Br. Ex. B, Doc. 28-2). For the purpose of contribution limits, "a contribution to a campaign committee of a candidate for any public office shall be deemed to be a contribution to such candidate." O.C.G.A. § 21-5-42.

The Act's regulation of candidate committees as singular entities which are essentially stand-ins for the candidates avoids a number of constitutional issues. For one, there can be little doubt that a candidate committee will be under the control of or have the major purpose of electing the candidate. For another, it serves as a means to channel reporting of non-monetary contributions to the entity most capable of handling these responsibilities.

The function of candidate committees as a means to channel reporting of non-monetary contributions by individuals was illustrated in *Fortson*. 208 S.E.2d at 75. In that case, the Georgia Supreme Court upheld the constitutionality of the predecessor statute to the Act, including against a challenge that it violated the constitution by requiring reporting of speech in support of a candidate. *Id.* First, the court interpreted the Act's definition of contribution to exclude volunteer services such as "the private citizen's act of espousing or endorsing his candidate." *Id.* The court explained that "[t]his activity might take the form, for example, of

propagandizing among one's friends, or putting up campaign posters."[9] But the court noted that "where one expands his audience by purchasing, for example, an advertisement promoting the candidate in a newspaper, money changes hands and the question must be faced whether such an activity is a 'contribution.'" *Id.*

The court next turned to whether, properly defined as a contribution, the Act was unconstitutional as to such contributions. The court recognized that "[t]he Act prohibits the making of a contribution except to the candidate or his campaign committee" but that "activities in the exercise of First Amendment freedoms may not be harshly channeled and controlled simply by being deemed 'contributions,' for these activities are constitutionally protected from significant legislative chilling." *Id.* To avoid a constitutional issue, the court "construe[d] this Act to mean that this and other financial outlays by persons in the course of the exercise of First Amendment rights, shall be deemed to be the equivalent of a direct contribution to the candidate or his campaign committee, so that the contributor is not in violation of the Act." *Id.* at 76. Moreover, the court held that such contributions would be subject to the reporting requirement of the candidate "if

---

[9] The Act now provides that contributions and expenditures "specifically shall not include the value of personal services performed by persons who serve without compensation from any source and on a voluntary basis." O.C.G.A. § 21-5-3(7), (12).

within his knowledge or if such knowledge might be discovered by reasonable inquiry." *Id.*

In contrast, the Act appears to place no limit on the number of ballot committees that can exist. So long as a person (including an individual) spends at least $500 "influencing . . . [the] voter approval or rejection" of a ballot measure, that person is a ballot committee. O.C.G.A. §§ 21-5-3(2), (12), (2); 21-5-34(a)(2)(A). So, if the hypothetical media buyer in *Fortson* bought an advertisement related to a ballot measure (and spent $500), he would not be deemed a contributor to a campaign committee, he would *be* a campaign committee. Indeed, so broadly does the plain language of the Act sweep in defining who is a ballot committee that Defendant Carr's predecessor had to clarify that contributors to ballot committees do not themselves become ballot committees by virtue of their contributions. 1994 Ga. Op. Att'y Gen. 64 (No. U94-2), 1994 WL 32769. Being deemed a ballot committee entails reporting requirements, including filing a report with the commission 15 days prior to the date of the election and filing a final report prior to December 31. O.C.G.A. § 21-5-34(a)(2)(A). Moreover, "[a]ll advertising pertaining to referendums shall identify the principal officer of such campaign committee by listing or stating the name and title of the principal officer." *Id.* § 21-5-34(a)(2)(B). And, as Plaintiffs discovered, being deemed a campaign committee

carries the possibility of having your bank records subpoenaed and combed through.

Nonetheless, the Eleventh Circuit has already upheld similar regulations of ballot committees as substantially related to the government's interest in promoting an informed electorate. *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1249 (11th Cir. 2013). Specifically, the court noted that "reporting requirements are allowed under our Constitution, and if there is something to report, it would make sense that Challengers would be tracking contributions anyway." *Id.* at 1250. It held that disclosure requirements "advance the government's informational interest even as they apply to small groups in Florida and require the tracking of any and all donations," because "disclosure of a plethora of small contributions could certainly inform voters about the breadth of support for a group or a cause." *Id.* at 1250–51.

Plaintiffs assert that *Worley* is not dispositive of this case for at least two reasons. First, in *Worley*, there was no dispute that election activities were the plaintiffs' major purpose—a fact noted by the Eleventh Circuit in distinguishing the plaintiffs' proffered authority. *Id.* at 1252 ("The Eighth Circuit left no question that groups 'whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question,' like Challengers here, would have to comply with the state political fund disclosure requirements challenged in

*Minnesota Citizens*.") (quoting *Minn. Citizens*, 692 F.3d at 877 n. 11); *see also id.* at 1252 n.7 ("But in Florida, in contrast to Minnesota, for all elections, including ballot issue elections, '[c]orporations regulated by chapter 607 or chapter 617 or other business entities formed for purposes other than to support or oppose issues or candidates are, in fact not considered political committees.' Fla. Stat. § 106.011(1)(b). In other words, there is no *Minnesota Citizens* problem with a lack of a 'major purpose' test because the law does not 'impose[ ] ... requirements on all associations, regardless of the association's purpose.'") (quoting *Minn. Citizens*, 692 F.3d at 875 n. 10).

Second, *Worley* was decided before *Bonta* clarified that exacting scrutiny requires determining whether a law is narrowly tailored. Relatedly, the Court observes that the Eleventh Circuit applied the usual "no set of circumstances" test for the plaintiff's facial challenge, 717 F.3d at 1250, rather than the "substantial number of . . . applications" test *Bonta* applied for First Amendment overbreadth challenges. 141 S. Ct. at 2387.[10]

A few courts have applied *Bonta*'s narrow tailoring requirement to election regulations. *E.g. Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021), *cert. denied*,

---

[10] The Eleventh Circuit noted that while it "decline[d] to address Florida's failure to set minimum thresholds on disclosure, [it did] have concerns about the burdens that the lack of these minimums place on truly small grassroots groups with little experience and little money. However, because this appeal is properly viewed as a facial challenge, the issue need not be decided here." *Worley*, 717 F.3d at 1253 n.8.

142 S. Ct. 2647 (2022); *see also Smith v. Helzer*, No. 3:22-CV-00077-SLG, 2022 WL 2757421, at *5 (D. Alaska July 14, 2022), *appeal docketed* No. 22-35612 (9th Cir. Aug. 3, 2022) (distinguishing *Bonta* based on its "extensive record" showing the government rarely used donor information to further its stated interest).

*Gaspee Project* upheld three Rhode Island disclosure requirements: "the requirement that covered organizations disclose donors of over $1,000; the requirement that covered organizations disclose their own identity to the Board; and the requirement that covered organizations identify themselves and their five largest donors on certain electioneering communications." 13 F.4th at 88. The act in question had two criteria that triggered its application. First, it "applies if an organization spends $1,000 or more on independent expenditures or electioneering communications within one calendar year." *Id.* (citing R.I. Gen. Laws § 17-25.3-1(b)). The Act defined "independent expenditure" as "an expenditure that, when taken in context, 'expressly advocates the election or defeat of a clearly identified candidate, or the passage or defeat of a referendum,'" but importantly "exempts from the definition of independent expenditures . . . 'news stor[ies], commentar[ies], or editorial[s],' 'candidate debate[s] or forum[s],' or 'communications made by any business entity to its members, owners, stockholders, or employees' as well as most "internet communications." *Id.* at 82–83 (citing R.I. Gen. Laws § 17-25-3(17)). The Act defined an "electioneering

communication" as "a communication that 'unambiguously identifies a candidate or referendum' and which is made within sixty days of a general election or referendum or within thirty days of a primary election." *Id.* at 83 (citing R.I. Gen. Laws § 17-25-3(16)). An electioneering communication also must be "targeted to the relevant electorate," meaning it can be received by 2,000 or more persons who can vote on the issue. *Id.* at 88–89 (citing R.I. Gen. Laws § 17-25-3(16)). Second, the act "only applies when an organization crosses the spending threshold and spends that money in a particular time frame — within one year of an election for independent expenditures and, for electioneering communications, within either thirty or sixty days of an election (depending on the type)." *Id.* at 88.

The First Circuit held that the "the spending threshold tailors the Act to reach only larger spenders in the election arena and at the same time shapes the Act's coverage to capture organizations involved in election-related spending as opposed to those engaged in more general political speech." *Id.* "In addition to the spending threshold," the court wrote, "the Act contains temporal limitations that tether the Act's disclosure requirements to the Board's informational interest. The fact that the Act only applies when an organization crosses the spending threshold and spends that money in a particular time frame—within one year of an election for independent expenditures . . . links the challenged requirements neatly to the Board's objective of securing an informed electorate." *Id.* (citations omitted).

Finally, the law was narrowed by the fact that it defined "electioneering communications" to those that "can be received by two thousand . . . or more persons in the district the candidate seeks to represent or the constituency voting on the referendum." *Id.* at 88–89 (citing R.I. Gen. Laws § 17-25-3(16)). Based on this narrow tailoring, the First Circuit upheld the Rhode Island act. *See id.*

The Georgia Act has some similarities to the Rhode Island act but several important differences. First, while not entirely dispositive, the Act has a lower spending threshold for ballot committees: $500 versus $1,000. Second, under the Rhode Island act, expenditures which count toward the threshold are limited to (a) independent expenditures, which carves out among other things news stories, commentaries, editorials, communications to employees, and most internet communications; and (b) electioneering communications which must be made close to an election and must be able to reach a certain audience.[11] Finally, Georgia's Act is not temporally limited. Once the $500 threshold has been met, all expenditures made and contributions received from the date of the first contribution and expenditure received through the date of the election must be reported. O.C.G.A. § 21-5-34(a)(2)(A).

---

[11] Though not discussed by the First Circuit, the Rhode Island Act also appears to exempt most internet communications from the definition of electioneering communications. R.I. Gen. Laws Ann. § 17-25-3.

On top of the foregoing differences from the law approved in *Gaspee Project*, the Georgia Act does not limit its application of ballot committees to major purpose entities. As the Seventh Circuit noted in *Barland*, while a major purpose limitation is not a constitutional requirement, imposing "full, formal PAC-like burdens on these speakers" raises overbreadth concerns. 751 F.3d at 839 (citing *Madigan*, 697 F.3d at 487).

At the end of the day, a state retains flexibility in dealing with non-major purpose entities. It can either carve out or provide some sort of less restrictive alternative to full-fledged PAC-like burdens for such entities, or it can narrowly tailor its regulations to ensure that its laws sweep no more broadly than necessary as was approved in *Gaspee Project*. But a law that renders anyone who spends $500 on constitutionally-protected expression a full-fledged campaign committee subject to the attendant chilling effects is not a permissible means of regulation. The Court has no trouble determining that, as to the Act's regulations of ballot committees "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Bonta*, 141 S. Ct. at 2383 (quoting *Stevens*, 559 U.S. at 473).

### ii.        Independent Committees

The Court turns next to the Act's regulation of independent committees. Plaintiffs assert that the Act's treatment of independent committees is not

narrowly tailored because the "the Act's disclosure requirements have seriously infringed on privacy of association and belief rights guaranteed by the First Amendment to Plaintiffs and their donors." (Pls.' Br. Supp. Mot. at 13, Doc. 13-1 (citing *Buckley*, 424 U.S. at 64; *Bonta*, 141 S. Ct. at 2388)).[12]

Aside from the fact that individuals cannot be independent committees and the lack of minimum dollar threshold, the Act's regulation of independent committees is largely similar to its regulation of ballot committees. There is no limitation on the number of independent committees that can exist for a given issue, advertisements require source identification, and there are no contribution or expenditure limits.

---

[12] The Parties agreed in their supplemental briefs that the Act provides no major purpose limitation for independent committees. (Pls.' Supp'l Br., Doc. 27; Defs.' Supp'l Br., Doc. 28). The Court agrees. First, unlike the definition of campaign committee, this definition does not incorporate the terms "contribution" or "expenditure." The Court interprets this to mean that the General Assembly intended to reach a broader subset of entities than those which strictly meet those definitions in their fundraising and activities. Second, the Act's broad reference to entities "which receive[] donations during a calendar year from persons who are members or supporters of the committee" supports a conclusion that independent committees raise money for both electoral and non-electoral purposes, which in turn supports a reasonable inference that committees expend funds for both electoral and non-electoral purposes. Third, the Act is specifically broad in its reference to "any elected office" or "any particular candidate," which eliminates the possibility that an independent committee must focus its effort on one specific election. Finally, no other portions of the Act refer to independent committees being "organized for the purpose of" any electoral outcome, unlike the Act's references to campaign committees. O.C.G.A. § 21-5-30(a).

The Court thus finds that the Act's regulation of independent committees is unconstitutionally overbroad for the same reasons the Court gave for ballot committees. While independent committees have a great deal of freedom to make unlimited independent expenditures under the Act, the Act's lack of any tailoring as to who is subject to regulation as an independent committee means that a substantial number of groups with limited resources to make expenditures will nonetheless be swept into the Act's regulations.

Moreover, unlike the regulations in *Gaspee Project*, there is no expenditure threshold, and expenditure is defined broadly to sweep in any express advocacy other than on a volunteer basis without regard to time or scale. 13 F.4th at 82–83, 88–89. Similar to the Wisconsin law rejected in *Barland*, the Act lacks "[a] simpler, less burdensome disclosure rule for occasional express-advocacy spending by 'nonmajor-purpose groups.'" *Barland*, 751 F.3d at 841.

Finally, the Court asked the parties whether the Act permits earmarking, that is, allowing independent committees to avoid disclosure of donors by agreeing in advance with such donors that the donation would not be used for campaign purposes." *Cf. Wyo. Gun Owners v. Buchanon*, No. 21-CV-108-SWS, 2022 WL 1310456, at *12 (D. Wyo. Mar. 21, 2022), *appeal docketed* No. 22-8021 (10th Cir. May 10, 2022) ("Courts in the Tenth Circuit have approved or encouraged the use of earmarking to further the government's interest in knowing who is speaking

about a candidate before an election.") (collecting cases). While Defendants appeared open to the possibility, the Parties agreed that under current law, whether a donation is a contribution is a fact-intensive inquiry. (Pls.' Supp'l Br., Doc. 27; Defs.' Supp'l Br., Doc. 28). A more streamlined procedure for accounting for non-electoral purpose donations would be an example of a measure the State could take to tailor the Act more narrowly.

These are simply examples of how the Act is not narrowly tailored. None of the foregoing issues are per se constitutional violations, but taken together, the Act is overbroad. As the Court noted above, the State retains some flexibility for how to regulate non-major purpose entities, either by exempting them from regulation or by more narrowly tailoring what counts as an expenditure and contribution to fit the law in a way which avoids regulating these entities unnecessarily. But treating all entities who spend any money on express candidate advocacy the same way, no matter the amount of the expenditure, the size of the donation relative to the organization, the size of the organization itself, and the reach of the message, is unconstitutionally overbroad.

Plaintiffs have thus shown a substantial likelihood of success on the merits for their First Amendment claims.

## C.    Other Injunctive Relief Factors

The Parties did not extensively brief the other injunctive relief factors, but the Court finds them satisfied here. "It is well-settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Cooper v. Raffensperger*, 472 F. Supp. 3d 1282, 1295 (N.D. Ga. 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). "Thus, when a plaintiff alleges her First Amendment rights have been infringed, irreparable injury is generally presumed." *Id.* (citing *Elrod*, 427 U.S. at 373). Finally, "[v]indicating First Amendment freedoms is clearly in the public interest," and the Court finds that the balance of hardships and public interest thus favor Plaintiffs. *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005).[13]

## D.    Remedy

In Plaintiffs' Complaint, Plaintiffs request the following injunction:

> Permanently enjoin Defendants from relying on, enforcing, or prosecuting violations of the Georgia Government Transparency and Campaign Finance Act, O.C.G.A. §§ 21-5-1 to -76, to the extent that it incorporates the unconstitutional definitions of "campaign committee" and "independent committee," against Plaintiffs and others similarly situated.

---

[13] The Court finds that no bond or other security is necessary under Federal Rule of Civil Procedure 65(c).

(Compl. at 15, Doc. 1). To comply with Federal Rule of Civil Procedure 65(d)(1)(C), the Court reframes the requested injunction as follows:

Defendants are preliminarily enjoined during the pendency of this case from enforcing, pursuant to O.C.G.A. §§ 21-5-6; 21-5-9; § 21-5-13, and any other civil or criminal regulatory provision, the Act's registration and reporting requirements solely as to violations pertaining to ballot committees and independent committees. Without limiting the foregoing, this injunction includes commencing or continuing the OSAH proceeding commenced by Defendants against Plaintiffs on September 21, 2022.

Defendants may continue to accept and process any voluntary registrations and reports from ballot committees and independent committees during the pendency of this case and may send out communications about statutory filing dates to such entities in the ordinary course of its operations so long as such communications note that pursuant to this Court's Order, compliance is voluntary until further notice as to such entities.

Unless otherwise ordered by the Court, this order does not apply to persons other than ballot committees or independent committees, candidates, candidate committees, recall committees, political action committees, separate segregated funds, or any other entities regulated by the Commission other than ballot committees or independent committees.

### Conclusion

For the reasons given above, Plaintiff's Motion for Preliminary Injunction (Doc. 13) is **GRANTED**. Defendants are **PRELIMINARILY ENJOINED** during the pendency of this case from enforcing the Act as set forth in this Order. Pursuant to the Court's December 9, 2022 Order (Doc. 30), Defendants are directed to file a responsive pleading no later than 15 days after the date of entry of this Order. The Parties are directed to confer and file a Joint Preliminary Report and Discovery Plan by January 12, 2023.

**SO ORDERED** this 14th day of December, 2022.

Victoria Marie Calvert
United States District Judge